867 S.W.2d 838 (1993)
L.S., Appellant,
v.
The STATE of Texas, Appellee.
No. 3-93-033-CV.
Court of Appeals of Texas, Austin.
November 24, 1993.
*840 Stan Kerr, Austin, for appellant.
Ken Oden, County Atty., Darius L. Davenport, Asst. County Atty., Austin, for appellee.
Before CARROLL, C.J., and KIDD and B.A. SMITH, JJ.
CARROLL, Chief Justice.
L.S. appeals an order extending his involuntary commitment at the Austin State Hospital. Tex. Health & Safety Code Ann. § 574.066 (West 1992). After a jury trial, the probate court ordered L.S. committed to the Austin State Hospital for a period not to exceed twelve months. L.S. challenges the legal and factual sufficiency of the evidence supporting the jury's affirmative findings required for renewal of commitment and argues that the court did not specify the basis for its renewal. L.S. also argues that the trial court erred in determining that Austin State Hospital was the least restrictive available alternative setting for his mental health treatment. We will affirm.

BACKGROUND
L.S. is mentally retarded and suffers from schizophrenia. He has stayed at the Austin State Hospital since 1989. In 1992, the State applied for renewal of an order for extended mental health services for a period not to exceed twelve months. Tex. Health & Safety Code Ann. § 574.066 (West 1992).[1]
At trial, the jury heard testimony from Dr. Gilliland, a staff psychiatrist, Dortha Seals, a social worker, and Dolan Henderson, a therapist. All of these witnesses treated L.S. or had daily contact with L.S. at the Austin State Hospital. In their testimony, they described L.S. and his specific behaviors to support their opinion that L.S. meets the statutory criteria for extended mental health services. L.S. testified in his own behalf. While some of his responses were incoherent, at other times he spoke clearly, stating that he wanted to go home with his mother if possible or go to a halfway house.
*841 The jury found that L.S. was mentally ill, that his condition would continue for more than ninety days, and that L.S. had received in-patient mental health services for at least sixty consecutive days within the twelve months immediately preceding the hearing. The jury also found that as a result of his mental illness, L.S.: (1) is likely to cause serious harm to himself; (2) suffers severe and abnormal mental, emotional, or physical distress; (3) does not have the ability to function independently; (4) is unable to make a rational and informed decision as to whether or not to submit to treatment; and (5) is dangerous. Based on these findings, the probate court granted the application for renewal and committed L.S. to the Austin State Hospital.

DISCUSSION
To renew an order for extended mental health services, a jury must do more than simply find that the person is mentally ill. Tex. Health & Safety Code Ann. §§ 574.035(a),.066(f) (West 1992). A jury must also find by clear and convincing evidence that, as a result of his mental illness, the person:
(A) is likely to cause serious harm to himself;
(B) is likely to cause serious harm to others; or
(C) will, if not treated, continue to suffer severe and abnormal mental, emotional, or physical distress, will continue to experience deterioration of his ability to function independently, and is unable to make a rational and informed decision as to whether or not to submit to treatment;
Tex. Health & Safety Code Ann. § 574.035(a)(2)(A)-(C) (West 1992). Only one statutory criterion must be met under section 574.035(a)(2). However, the jury found that the requirements of both subsections (A) and (C) had been met, and made no finding with respect to (B).
To be clear and convincing, the evidence must include expert testimony and include a recent overt act or continuing pattern of behavior "that tends to confirm the likelihood of serious harm to the proposed patient or others or the proposed patient's distress and the deterioration of ability to function." Tex. Health & Safety Code Ann. § 574.035(d) (West 1992). Moreover, clear and convincing evidence is an intermediate evidentiary standard, requiring more than the preponderance of the evidence standard, but less than the reasonable doubt standard. State v. Addington, 588 S.W.2d 569, 570 (Tex.1979). There is no requirement that the evidence must be unequivocal or undisputed. Id.
In his first six points of error, L.S. challenges the legal and factual sufficiency of the jury's findings that L.S. met the requirements of section 574.035(a)(2)(A) & (C), that he is dangerous, and that his condition is expected to continue for more than ninety days.[2] In reviewing a no-evidence point, we must consider only the evidence and inferences that tend to support the jury's finding and disregard all evidence to the contrary. Alm v. Aluminum Co. of Am., 717 S.W.2d 588, 593 (Tex.1986), cert. denied, 498 U.S. 847, 111 S.Ct. 135, 112 L.Ed.2d 102 (1990). When reviewing the factual sufficiency of the jury's findings we must consider and weigh all the evidence and should set aside a finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex.1986); In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).
We first address the jury's findings that L.S. met the requirements of section 574.035(a)(2)(C): that L.S. will, if untreated, continue to suffer severe and abnormal mental, emotional, or physical distress, will continue *842 to experience deterioration of his ability to function independently, and is unable to make a rational and informed decision as to whether to submit to treatment.
Dr. Gilliland provided expert testimony that L.S. is mentally retarded and suffers from schizophrenia. He explained that L.S. is not fully oriented at any time, and often experiences delusions, such as believing that his head has been cut off or that he has been poisoned. He gave his opinion that, if not treated, L.S. would continue to suffer severe distress and would continue to experience deterioration of his ability to function independently. When asked to support this opinion with evidence of recent acts or patterns of behavior, Dr. Gilliland referred to three things: burning his skin with cigarettes, drinking excessive amounts of water, and an unauthorized departure from the unit for six days. These actions occurred within one to four months before trial.[3]
Dr. Gilliland explained that L.S. often ritualistically burned the skin on his fingers with cigarettes. In addition, Gilliland explained that L.S. drank water excessively, gaining as much as ten pounds within an eight-hour period on one occasion, resulting in lower serum sodium levels. Gilliland stated that the long-term risks of this behavior involved high blood pressure, congestive heart failure, and kidney problems.
Gilliland also told the jury about an unauthorized departure that L.S. made to Dallas approximately four months before trial. When L.S. returned six days later, Gilliland noticed a "significant deterioration in his function at that time," and concluded that "a relatively brief trip out of the hospital resulted in what I felt was an observable decompensation." He stated that L.S. was more agitated, his speech became more frantic, and he continually checked his neck to see if his head was attached. Gilliland said that this significant deterioration occurred even though he still had a fair amount of medication in his system.
On cross-examination, Dr. Gilliland agreed that the cigarette burns were not serious injuries and that L.S. was probably not currently burning himself. He also stated that L.S. was on a token-buying system and a water program, which controlled some of his behaviors and normalized his serum sodium levels. He further stated that L.S. had shown a significant improvement since he started receiving involuntary injections of medication in May 1992, and acknowledged that L.S. had received grounds privileges and had been considered for a home pass during Thanksgiving.
L.S. argues that this stabilization in his behavior precludes a finding of severe distress and deterioration under the statute. We disagree. The key language in subsection (C) is with respect to treatment. The jury must decide if the patient will continue to suffer severe distress and deterioration "if not treated." § 574.035(a)(2)(C). The jury can therefore consider the consequences of removing L.S. from the safety of his structured environment in the hospital.
Dr. Gilliland testified that L.S. could not survive safely outside a structured environment. He concluded that the involuntary injections of Haldol and the constant supervision and programs controlled much of his harmful behaviors, and absent the injections and treatment, these behaviors could return. He provided concrete examples of cigarette burning, excessive water drinking, and an unauthorized absence from the hospital that resulted in a rapid deterioration to support this opinion.
Dortha Seals and August Henderson provided similar testimony. Seals, a social worker at the hospital, stated that because L.S. was very intrusive with other people, he was assaulted by another patient about two or three months before trial. She also stated *843 that L.S. does not watch out for traffic. Henderson, a hospital therapist, also said that L.S. "plows" out into the street without looking. He further stated that L.S. has been assaulted on several occasions because he is intrusive. Henderson said he observed L.S. sticking nine-volt batteries to the exposed roots of his teeth, and said that L.S. had been caught trying to shoplift nine-volt batteries when Henderson took him shopping. He said that L.S. has to be prompted to maintain personal hygiene and sometimes uses his hands to clean himself after defecating, leaving feces smeared on his clothes. He concluded that L.S. could not function independently outside a structured environment.
Based on all of the testimony, there is sufficient evidence of a continuing pattern of behavior or recent overt acts as required under section 574.035(d). Legally and factually sufficient evidence supports the jury's findings with respect to severe distress and inability to function independently.
Legally and factually sufficient evidence also supports the jury's finding that L.S. is unable to make a rational and informed decision about whether to submit to treatment. Gilliland explained that medication is the "cornerstone" of treatment for L.S.'s schizophrenia. He stated that L.S. did not have any insight about his mental illness and consistently denied the need for psychiatric medication.
Gilliland described specific behavior to demonstrate L.S.'s inability to rationally decide about treatment. Before L.S. began receiving involuntary injections of Haldol, he would refuse liquid medication because it was not "blue" enough or because he feared that the medicine was poisoned. However, Gilliland also stated that L.S. makes an effort with the programs and understands some of the incentives. L.S. testified that he would take the "green" pill if he was released from the hospital, but when asked about Haldol, he said that it "cause[s] side effects."
While L.S. might have understood some of the incentives behind the behavioral programs, he refused medication on the basis of its color or upon fears that the medication was poisoned. A jury could reasonably conclude from the evidence that his reasoning with respect to treatment was irrational.
We conclude that the jury could find by clear and convincing evidence that all the elements of section 574.035(a)(2)(C) had been met. See Holliman v. State, 762 S.W.2d 656, 658 (Tex.App.Texarkana 1988, no writ); W.L. v. State, 698 S.W.2d 782, 785 (Tex. App.Fort Worth 1985, no writ); N.W. v. State, 678 S.W.2d 158, 160-62 (Tex.App. Beaumont 1984, no writ). We overrule L.S.'s second, third, and fourth points of error.
In his fifth point of error, L.S. challenges the legal and factual sufficiency of the jury's finding that L.S. is dangerous to himself, which he argues is an implicit requirement in section 574.035(a)(2)(C). We agree that a state cannot constitutionally confine, without more, a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of responsible family or friends. O'Connor v. Donaldson, 422 U.S. 563, 576, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396 (1975); see State v. Turner, 556 S.W.2d 563, 566 (Tex.1977) (holding that an involuntary mental patient is entitled to release at such time as he no longer presents a danger to himself or others); Ex parte Webb, 625 S.W.2d 372, 373-74 (Tex.Civ.App.San Antonio 1981, writ dism'd). In addition to being incapable of surviving safely by himself, a person is also dangerous to himself if he cannot make a rational decision to receive treatment; such a person poses a threat to himself because the nature of his illness prevents him from seeking treatment which might improve his condition. Johnson v. State, 693 S.W.2d 559, 563 (Tex.App.San Antonio 1985, no writ).
Dr. Gilliland believed that L.S.'s severe mental illness and his lack of insight into this illness made him dangerous to himself, especially if he were released from the Austin State Hospital. He stated that in terms of L.S.'s own abilities, L.S. could not *844 prevent his dangerousness. While Gilliland agreed on cross-examination that "as he sits in here" [the court room], L.S. was not dangerous to himself, he later explained on redirect that the structured environment and medication control his behavior, but absent this intervention he considered it likely that L.S. would harm himself. Earlier in his testimony, Dr. Gilliland also stated, "I would feel that in his present state if he was outside of his current very highly structured, well supervised environment that, yes, he would be likely to injure himself."
Dr. Gilliland gave the jury a factual basis to support these opinions by his description of L.S.'s behavior with respect to burning his skin with cigarettes, excessive water drinking, and his deterioration after the unauthorized departure. In addition, Seals' and Henderson's testimony established that L.S. had been assaulted by other patients, had attempted to shoplift nine-volt batteries and place them in his mouth, could not maintain sanitary hygiene, and has walked out into the street without looking. Finally, the evidence showed that L.S. could not make a rational decision with respect to treatment.
The evidence is sufficient for the jury to reasonably conclude that L.S. is dangerous to himself. We overrule the fifth point of error. Because only one statutory criterion must be met under section 574.035(a)(2), we do not reach point of error number one with respect to the jury's finding that L.S. is likely to cause serious harm to himself.
In his sixth point of error, L.S. challenges the legal and factual sufficiency of the jury's findings that L.S.'s condition is expected to continue for more than ninety days. Tex. Health & Safety Code Ann. § 574.035(a)(3) (West 1992). He argues that, although Gilliland gave his opinion that L.S.'s condition would continue for more than ninety days, Gilliland did not give the basis for this opinion. When considering the whole of Gilliland's testimony, we believe there were sufficient facts from which the jury could make this finding. Gilliland described specific behaviors such as the excessive water drinking, the cigarette burning, and his unauthorized departure, and noted his significant deterioration upon return. While L.S. points out that he received ground privileges and that the hospital tried to arrange a pass for him to go home during Christmas, Gilliland had also stated that L.S. requires a structured environment. We overrule L.S.'s sixth point of error.
In his seventh point of error, L.S. argues that the court erred in not specifying the criteria for commitment pursuant to section 574.035(b). Section 574.035(b) requires the judge or jury to specify which criterion listed in subsection (a)(2) forms the basis for the decision. Tex. Health & Safety Code Ann. § 574.035(b) (West 1992). In its order for extended mental health services, the court included the jury's specific findings on the statutory criteria. The jury found that L.S. was likely to cause serious harm to himself, thus finding that section 574.035(a)(2)(A) had been met, and found the three elements required under section 574.035(a)(2)(C), that L.S. will, if not treated, continue to suffer severe and abnormal distress, will continue to deteriorate in his ability to function, and is unable to make a rational decision as to whether to submit to treatment. The jury made no finding that L.S. was likely to cause serious harm to others under section 574.035(a)(2)(B). Thus the order provides sufficient notice as to which criteria formed the jury's decision. The statute does not prohibit the jury from finding that more than one criterion has been met. We conclude that the jury complied with section 574.035(b). We overrule the seventh point of error.
In his eighth point of error, L.S. argues that the trial court erred in determining that Austin State Hospital was the least restrictive appropriate setting available for mental health treatment. L.S. argues that the evidence is insufficient to support the court's order for inpatient treatment. We therefore treat his eighth point of error as a factual sufficiency challenge to the court's implied finding that the Austin State Hospital *845 is the least restrictive appropriate setting available.
L.S. first argues that the least-restrictive letter filed under section 574.012 was so defective as to be meaningless, and that the application for renewal of extended mental health services did not explain in detail why a less restrictive setting was not appropriate as required by section 574.066(b). Tex. Health § Safety Code Ann. §§ 574.012, .066(b) (West 1992). We have reviewed the application and letter in the transcript. While we agree that the comments are brief, we review the court's finding that Austin State Hospital is the proper setting of care against all of the evidence that the court had before it. See Cain v. Bain, 709 S.W.2d 175, 176 (Tex.1986); In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).
Section 574.036(d) and (e) provide the following:
(d) The judge shall order the mental health services provided in the least restrictive appropriate setting available.
(e) The judge may enter an order:
(1) committing the person to a mental health facility for inpatient care; or
(2) requiring the person to participate in other mental health services, including community center programs and services provided by a private psychiatrist or psychologist.
Tex. Health & Safety Code Ann. § 574.036(d), (e) (West 1992). Under this statute, the judge has two basic choices: he may order in-patient services under (e)(1) or out-patient services under (e)(2). An in-patient mental health facility provides twenty-four hour residential psychiatric services and can be a state hospital, a private mental hospital, or a community center. Tex. Health & Safety Code Ann. § 571.003(9) (West 1992). With out-patient services, the patient is ordered to participate in mental health programs and does not require twenty-four hour commitment. See Tex. Health & Safety Code Ann. § 574.037 (West 1992).
The court had evidence before it that L.S. required a highly structured and supervised environment. Dr. Gilliland stated that at the Austin State Hospital, L.S. is involved in "virtually 16-hour a day every waking hour efforts at teaching him how to manage his behavior and impulses, and control himself," and is "in a situation where we know he has strict supervision and an active training program, as well as, guaranteed medication." He believed that absent this type of intervention, nothing prevents L.S. from being dangerous to himself. He also believed that L.S. would not take his medication if released from the hospital because L.S. fears the medication is poisoned and does not believe he needs it.
When asked by L.S.'s counsel about placement outside of Austin State Hospital, Gilliland replied, "If it were possible to find a place with a degree of supervision and a degree of active programming where he could continue with the skills building that he had undertaken, yes, we would have wanted to look for that." However, Gilliland also testified that to his knowledge, L.S.'s home county had limited programs for a person with his needs. While Dr. Gilliland said that he had in the past tried to arrange a pass from the hospital for L.S. to be with his family over Thanksgiving, he explained that his family declined to take him "because of some problems that he had caused in the past at home."
The court had evidence before it that L.S. required a highly structured environment, that there were few alternative programs available in his home county, and that his family had not accepted L.S. when the hospital tried to arrange a home pass during Thanksgiving. The court could reasonably infer that without family support and available alternative settings that could provide the proper structure L.S. needed, in-patient service at the Austin State Hospital was the most appropriate and least restrictive setting available. See Sims v. State, 816 S.W.2d 502, 509 (Tex.App.Houston [1st Dist.] 1991, writ denied) (trial court did not err in finding state hospital the appropriate treatment alternative where evidence showed that hospital's structure was vital to appellant's needs); *846 Carter v. State, 611 S.W.2d 165, 167 (Tex.Civ. App.Austin 1981, writ ref'd n.r.e.) (holding evidence sufficient to confine patient to mental hospital when patient cannot receive supervision she requires in any less restrictive setting, psychiatrist knows of no intermediate facilities designed for patient's characteristics, and family was not willing or able to undertake patient's custody at that time); Jones v. State, 602 S.W.2d 132, 136 (Tex.Civ. App.Fort Worth 1980, no writ) (holding that while trial court signed order releasing patient from hospital and admitting him to out-patient community program, it did not err in ultimately confining him to state hospital when no one would undertake the responsibility of his care). We overrule L.S.'s eighth point of error.
Accordingly, we affirm the trial court's judgment.
NOTES
[1] The court order will expire on December 4, 1993, and testimony at oral argument suggested that L.S. may currently be on furlough at this time. However, both parties agree that the mootness doctrine does not apply to appeals of mental health commitments such as this one. State v. Lodge, 608 S.W.2d 910 (Tex. 1980).
[2] L.S. did not raise these factual sufficiency points in a motion for new trial, which is required for appellate review. Tex.R.Civ.P. 324(b)(2); Tex.R.App.P. 52(d). However, because this case involves L.S.'s confinement in a mental institution, we consider these points without preservation of error. State For Interest of P.W., 801 S.W.2d 1, 2 (Tex.App.Fort Worth 1990, writ denied).
[3] The trial was held on December 4, 1992. Dr. Gilliland stated that the latest reported cigarette burning incident occurred on November 11, 1992, and the excessive water drinking and lower serum sodium levels were noted on October 12th, 14th, and 20th of 1992. The unauthorized departure occurred on August 28, 1992.